UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
DIVISION

Byron E. Blake Jr

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**v.**

Jacob Cherry a/k/a 1090 Jake

*(Write the full name of each defendant. The caption must include the names of all of the parties. Fed. R. Civ. P. 10(a). Merely listing one party and writing "et al." is insufficient. Attach additional sheets if necessary.)*

**Complaint for a Civil Case**

4:26-cv-01116-CDP

Case No.
*(to be assigned by Clerk of District Court)*

Plaintiff requests trial by jury:

Yes No

## CIVIL COMPLAINT

*NOTICE:*

*Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include only: the last four digits of a social security number, the year of an individual's birth, a minor's initials, and the last four digits of a financial account number.*

*Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.*

*In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed without prepaying fees or costs.*

# I. The Parties to This Complaint

## A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Byron E. Blake Jr |
| Street Address | 1303 Fox Chase Dr |
| City and County | St. Charles, St. Charles |
| State and Zip Code | MO 63301 |
| Telephone Number | 773-913-5737 |
| E-mail Address | Officialbyronblake@gmail.com |

## B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Jacob Cherry |
| Job or Title | |
| Street Address | 23338 DINHURST CT |
| City and County | LAND O LAKES, Pasco |
| State and Zip Code | Florida 34639 |
| Telephone Number | |
| E-mail Address | 1090jake@gmail.com |

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant. If you are suing for violation of your civil rights, you must state whether you are suing each defendant in an official capacity, individual capacity, or both.)*

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only three types of cases can be heard in federal court. Provide the information for this case. *(Include all information that applies to your case)*

### A. Federal question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B. Suit against the Federal Government, a federal official, or federal agency

List the federal officials or federal agencies involved, if any.

### C. Diversity of Citizenship

These are cases in which a citizen of one State sues a citizen of another State or nation, and the amount at stake is more than $75,000. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

1. The Plaintiff(s)

The plaintiff, *(name)* Byron E Blake Jr, is a citizen of the State of *(name)* Missouri.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

If the defendant is an individual

The defendant, *(name)* Jacob Cherry, is a citizen of the State of *(name)* Florida *Or* is a citizen of *(foreign nation)* __________.

If the defendant is a corporation

The defendant, *(name)* __________. is incorporated under the laws of the State of *(name)* __________, and has its principal place of business in the State of *(name)* __________ *Or* is incorporated under the laws of the State of *(foreign nation)* __________, and has its principal place of business in *(name)* __________.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy----the amount the plaintiff(s) claims the defendant(s) owes or the amount at stake----is more than $75,000, not counting interest and costs of court, because *(explain)*:

The plaintiff is requesting $10,000,000 or an amount to be determined at trial but in excess of $75,000.00

## III. Statement of Claim

Type, or neatly print, a short and plain statement of the **FACTS** that support your claim(s). For every defendant you have named in this complaint, you must state what he or she personally did to harm you. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Do not make legal arguments, or cite court cases or statutes. You may attach additional pages if necessary.

Your statement of claim must include all of the following information:

1. What happened to you?
2. When did it happen?
3. Where did it happen?
4. What injuries did you suffer?
5. What did each defendant personally do, or fail to do, to harm you?

See attached document

## IV. Relief

State briefly and precisely what damages or other relief you want from the Court. Do not make legal arguments.

See attached document.

Do you claim the wrongs alleged in your complaint are continuing to occur now?

Yes No

Do you claim actual damages for the acts alleged in your complaint?

Yes No

Do you claim punitive monetary damages?

Yes No

If you indicated that you claim actual damages or punitive monetary damages, state the amounts claimed and the reasons you claim you are entitled to recover these damages.

See attached document.

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 20 day of August, 20 2026.

Signature of Plaintiff(s) [signature]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**BYRON E. BLAKE, JR., Plaintiff,**

**v.**

**JACOB CHERRY, Defendant.**

**Case No. 4:26-cv-01116-CDP**

# SECOND AMENDED COMPLAINT

Plaintiff Byron E. Blake, Jr., proceeding pro se, alleges as follows against Defendant Jacob Cherry. This pleading preserves the substance of Plaintiff's prior allegations and adds allegations concerning Defendant's later attacks on the credibility of Plaintiff's records-based investigation, together with additional facts alleged to bear on Defendant's knowledge, intent, and state of mind.

## I. PARTIES

1. Plaintiff Byron E. Blake, Jr. publishes investigative commentary and video content concerning criminal-justice records and public claims made by online personalities.

2. Defendant Jacob Cherry, also publicly known as "1090 Jake" and associated with the YouTube platform "End of Sentence," is an online content creator who publishes commentary concerning criminal cases, incarceration, criminal records, and public figures.

## II. JURISDICTION AND VENUE

3. Plaintiff realleges the jurisdictional and venue allegations asserted in the original complaint. Plaintiff alleges that this Court has subject-matter jurisdiction as previously pleaded and that venue is proper in this District.

4. Plaintiff alleges that Defendant intentionally published the challenged statements to a nationwide internet audience, including viewers in this District, and that Plaintiff suffered reputational and business injury in this District.

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Investigation and the Parties' Public Dispute

5. Plaintiff conducted an investigation into public representations made by Defendant concerning Defendant's incarceration, prison history, alleged assaults, protective-custody history, photographs, housing history, criminal cases, and public claims concerning cooperation with authorities.

6. The investigation was not fabricated. Plaintiff submitted formal public-records requests to the Florida Department of Corrections ("FDC"), obtained FDC responses and records, reviewed

movement and housing history, disciplinary and investigative materials, photographs, grievances, witness statements, and law-enforcement reports, and compared those records with Defendant's own public statements.

7. Defendant was aware of Plaintiff's investigation and publicly responded to it. In a response video, Defendant characterized Plaintiff and/or Plaintiff's investigation as fraudulent and ultimately stated: "The cut ain't fake. The picture ain't fake, but y'all see who is." Source: Defendant response video, approximately 0:00–7:19 and 46:54: https://youtu.be/hy7LjCoCZ2U?si=jnIg1AaLKc2rnbYX

**B. The Photograph and Alleged Facial Assault**

8. Plaintiff submitted an FDC public-records request seeking inmate booking photographs or mugshots associated with Defendant's incarceration at identified facilities. FDC responded that it reviewed its files and that the photographs produced were the photographs located in Defendant's inmate classification file.

9. FDC produced two responsive photographs: a 2013 identification photograph and a 2015 photograph. Plaintiff compared those official records with a separate image Defendant represented as an authentic prison photograph depicting a fresh facial wound.

10. In his response video, Defendant represented that the disputed photograph was genuine, stated that it had been taken at Lancaster shortly after an alleged slashing and transfer from Lake Butler, and stated that the wound was fresh and had been glued rather than stitched. Source: approximately 4:03–7:19: https://youtu.be/hy7LjCoCZ2U?si=jnIg1AaLKc2rnbYX

11. Plaintiff does not allege merely from FDC's failure to produce the disputed image that the image was necessarily fabricated. Plaintiff alleges that his investigation had a concrete documentary basis and that Defendant falsely portrayed Plaintiff and the investigation as fraudulent while purporting to rebut that records-based investigation.

12. Plaintiff separately requested FDC records concerning the alleged assault/battery, including disciplinary records, investigative records, and inmate requests for protection. FDC responded by producing the responsive disciplinary and investigative history located in Defendant's records. Plaintiff alleges that the production contained no disciplinary or investigative record documenting the particular slashing/assault Defendant publicly described, despite Defendant's claim that the incident resulted in institutional medical attention. Plaintiff does not allege that the absence of such a record conclusively proves that no assault occurred; Plaintiff alleges that the absence was a material documentary inconsistency that formed part of the good-faith basis for his investigation and for questioning Defendant's account.

**C. Lancaster Housing and the Approximately Eight-Day Investigative Finding**

13. Plaintiff obtained FDC movement and housing records to reconstruct Defendant's housing history at Lancaster.

14. Those records reflect an initial Lancaster C.I. housing entry in A Dorm, a later B-Dorm/open-population entry beginning approximately October 21, 2013 before transfer to Lancaster Work Camp on October 24, 2013, and a later return to B Dorm/open status beginning

approximately January 11, 2014 before administrative confinement beginning approximately January 16, 2014.

15. Plaintiff's approximately eight-day "main compound" finding was an analytical conclusion derived from the documented B-Dorm/open-population periods, not a representation that FDC itself used the phrase "eight days on the main compound."

16. Plaintiff's methodology also relied on Defendant's own descriptions of Lancaster. In an interview on the Locked In with Ian Bick platform, Defendant described B Dorm as the "jungle dorm." Source: Locked In with Ian Bick: https://youtu.be/GPi-tYJ8Weg?si=Q_FbjpQqRAkXLi9A

17. In another discussion, Defendant's guest stated that new arrivals at Lancaster were placed in an orientation dorm with other new arrivals and were "with the CO constantly," while Defendant visibly signaled agreement. Plaintiff relied on that statement as part of his distinction between orientation housing and the B-Dorm/open-population period.

18. Defendant separately stated that the craziest thing he witnessed at Lancaster occurred at the work camp rather than the main unit, adding that "there was plenty of things that happen at the main unit" that he "just didn't get to witness." Source, approximately 2:27–2:36: https://youtu.be/NZhT9-vOBGE?si=gEQyx5N9Mn9qBcEt

19. A contemporaneous grievance attributed to Defendant further distinguishes "confinement" from "the main compound," stating: "I'm not safe in confinement or on the main compound."

20. A viewer later repeated the approximately eight-day finding to Defendant. Defendant responded that he had spent time at Lancaster before the work camp and later returned to the main compound, concluding: "Stop spreading BS." Plaintiff alleges that the return to Lancaster was already included in Plaintiff's calculation.

**D. Defendant's Direct Attacks on Plaintiff and Plaintiff's Family**

21. On or about June 6, 2026, Defendant published a video targeting Plaintiff titled "Byron Blake Exposed," acknowledged Plaintiff's investigation, and referred to Plaintiff in derogatory terms.

22. Defendant alleged that Plaintiff's father had cooperated against codefendants and had been convicted of a serious offense involving a minor; Defendant also made allegations concerning Plaintiff's brother.

23. Defendant further stated, in substance: "using his logic I'm a cop cuz my great-grandfather was a cop but your daddy a rat your brother a rat … what does that make you."

24. Plaintiff alleges that he never asserted that Defendant was a police officer merely because Defendant's grandfather or great-grandfather was a police officer. Plaintiff alleges that Defendant invented that premise and substituted it for the documentary basis of Plaintiff's actual investigation.

25. In a separate interview, Defendant stated, in substance, that Plaintiff's father had engaged in sexual misconduct involving a minor, asked "what does that make him," and asserted that Plaintiff wrote a petition seeking his father's release "knowing he did that."

26. Plaintiff alleges that he authored a support petition in 2017, but that the records on which Defendant relied for the allegation concerning Plaintiff's knowledge were sealed and were not publicly accessible until 2021. Plaintiff therefore alleges that Defendant's assertion that Plaintiff authored the 2017 petition "knowing" those allegations was false or materially misleading.

27. Plaintiff does not allege that Defendant expressly accused Plaintiff of personally committing a sexual offense. Plaintiff alleges instead that Defendant deliberately juxtaposed allegations about Plaintiff's father with "what does that make you?" in order to transfer stigma from a relative's alleged conduct to Plaintiff.

**E. Home-Invasion and Firearm Allegations**

28. Defendant also accused Plaintiff of committing a violent home invasion involving a firearm and of placing a firearm to an infant's head.

29. Plaintiff alleges those statements were materially false. Plaintiff alleges that he was not convicted of home invasion or a firearm offense arising from that matter and that the case was resolved as criminal trespass.

30. Plaintiff alleges that Defendant markets himself as skilled in reading and "checking" criminal paperwork and histories and therefore knew, or recklessly disregarded, the distinction between an allegation in an initial report and the actual disposition of a criminal case.

**F. Documentary Basis of Plaintiff's Cooperation Investigation**

31. Plaintiff's investigation concerning Defendant's public treatment of alleged "rats," "snitches," and cooperators was based on Defendant's own records and statements, not on the occupation of Defendant's relatives.

32. An FDC Witness Statement, Form DC6-112C, identifies "Cherry, Jacob," DC # C07652, as the inmate providing a written statement concerning an alleged aggravated battery. Defendant reported being struck twice in the head with a "rock in a sock" and expressly identified "Rashad Hart" as a witness, together with identifying inmate information.

33. A separate FDC grievance concerning the same January 16, 2014 incident states that inmate Jimmy Horey struck Defendant with a "rock and sock" on the head. Defendant also named additional inmates and correctional employees while describing the alleged incident and subsequent events.

34. Plaintiff does not allege that identifying an alleged assailant or witness automatically makes Defendant a confidential informant or "snitch." Plaintiff alleges that the records are direct documentary evidence that Defendant supplied correctional authorities with identifying information concerning another inmate as an alleged assailant and another inmate as a witness.

35. In a later public video, Defendant stated at approximately 25:49 that Jimmy Horey was the only inmate involved in the situation who named someone in a witness statement. Plaintiff alleges that this categorical representation is contradicted by Defendant's own FDC witness

statement identifying Rashad Hart as a witness. Source: https://youtu.be/_BXyt58MtoI?si=7LVw3L1nccP9Ciy1

**G. Burglary Records, Family Communications, and Jail Calls**

36. Plaintiff also investigated Defendant's public account of an armed-burglary prosecution. Hillsborough County Sheriff's Office Report No. HS 2012-506276 documents the armed-burglary investigation. Tampa Police Department Report No. 2012-560484 documents Defendant's October 7, 2012 arrest during a separate vehicle-burglary investigation and the recovery of a handgun that HCSO records state was confirmed as property taken in the earlier burglary.

37. Defendant publicly stated: "there's just no arrest report because I wasn't arrested for it I was already in jail and the charges were added on," and explained that he used his codefendant's arrest report to describe what happened. Source, approximately 19:22–19:30: https://youtu.be/CuALMG7A15A?si=ksrag6DwxZIENr5h

38. Plaintiff does not allege that Defendant's statement that the burglary charges were added while he was already incarcerated was necessarily false. Plaintiff alleges that the underlying HCSO investigative file contained materially more information concerning how Defendant became a suspect and the evidence developed against him than Defendant emphasized in his public account.

39. HCSO records document that Shawn Williams told investigators that Defendant lived with Williams and her partner, Cathy Wiecki; that Cathy was Defendant's aunt; that "Camilo" was Defendant's friend; and that Williams had recently seen Defendant leave the residence in an older-model white Honda. Other investigative material documented a suspicious white vehicle and later cellphone evidence reflecting numerous calls and several text messages among Defendant, Giraldo Kamilo, and Tyrell Sanders on the day of the burglary.

40. HCSO records also contain an interview with Cathy Wiecki in which she provided investigators information concerning Defendant's whereabouts and his relationship with "Camilo." Plaintiff relies on these records to show that his investigation concerned actual communications by persons close to Defendant with investigators, rather than a familial police-officer theory.

41. In a later interview, Cathy Wiecki stated that after Defendant's arrest a detective was recording her telephone calls with Defendant from jail, that the detective called her, and that she spent approximately two and one-half hours speaking with him about Defendant's personality, upbringing, and circumstances. Source, approximately 14:34–15:18: https://youtu.be/WnHrAlnpvCA?si=_pIfEZs58H24dYU4

42. Plaintiff does not allege that Cathy Wiecki's purpose was to incriminate Defendant. Her own description indicates that she was attempting to help Defendant. Plaintiff alleges that her account nevertheless confirms extensive communication with an investigating detective concerning Defendant.

43. Defendant separately acknowledged that while in county jail he called another person after suspecting a codefendant was cooperating, said in substance "y'all go handle that," and

later that night was taken to confinement. Defendant stated that a captain asked whether he had been "on the phone saying things you shouldn't have been saying." Source, approximately 14:46–16:06: https://youtu.be/D6IuGHNTvcE?si=dazFBp9V_2W1kOI6

44. Defendant attributes that confinement to the "y'all go handle that" call. Plaintiff disputes aspects of Defendant's characterization but does not plead as established fact that Cathy Wiecki's communications caused the confinement. Plaintiff alleges instead that the separate accounts corroborate that Defendant's jail calls were monitored and that communications involving Defendant and persons close to him were of investigative interest.

### H. Defendant's Own Public Distinction Between Reporting and "Snitching"

45. Defendant has publicly defended his dissemination of inmate-supplied prison footage against accusations of "snitching." At approximately 6:37–7:34, Defendant asked how he was "snitching on the inmates" when inmates were sending him videos, stated that he had made "generalized statements" about what he saw in prison, and stated that current prisoners "couldn't get the message out" so he used his platform "to be their voice." Source: https://youtu.be/_BXyt58MtoI?si=7LVw3L1nccP9Ciy1

46. In a screenshot of a public response from the verified @EndOfSentence account, Defendant similarly stated that he went on the news speaking about inmates overdosing and correctional officers allegedly covering the deaths up as natural deaths, and defended that conduct by invoking prison "reform."

47. The January 21, 2020 WSVN 7News investigation identifies Jacob Cherry as the former inmate who posted the inmate-recorded videos to YouTube, reports that currently incarcerated Florida inmates recorded the videos using smuggled cellphones, states that FDC was aware of the videos and took the information seriously, and shows the footage as part of the report. Source: https://wsvn.com/news/investigations/secret-inmate-videos-expose-contraband-crisis-the-state-calls-a-national-epidemic/

48. Plaintiff alleges that Defendant's later characterization of his activity as merely generalized recollections from years earlier materially minimized the fact that he also acknowledged receiving and disseminating contemporaneous audiovisual material supplied by current prisoners. Plaintiff does not allege that media reporting, standing alone, legally constituted cooperation with law enforcement.

### I. Mass Search and Correctional-Officer Arrest

49. Plaintiff's investigation further uncovered official FDC Office of Inspector General and Santa Rosa County Sheriff's Office records relevant to Defendant's categorical public statements asking what prisons were raided and what officers were arrested.

50. The WSVN investigation involving Defendant aired on January 21, 2020. Thirteen days later, on February 3, 2020, an FDC Office of Inspector General probable-cause affidavit, Agency Report No. 20-04700, states that FDC conducted a "mass search" of secured housing unit M-Dormitory at Santa Rosa Correctional Institution – Annex and recovered two contraband cellular telephones.

51. The affidavit states that one phone was submitted to the FDC Office of Inspector General cellular-telephone laboratory, that an extraction revealed communications with a telephone number identified as the personal number of Correctional Officer Jana Wood, and that the investigation developed probable cause for felony offenses involving introduction of contraband into a state correctional institution and unlawful use of a two-way communications device.

52. Santa Rosa County Sheriff's Office Report No. SRS020ARR001848 documents Wood's arrest on June 18, 2020.

53. Plaintiff does not allege that the presently available records conclusively establish that Defendant's January 21, 2020 media activity caused the February 3, 2020 mass search. Plaintiff alleges that the thirteen-day temporal proximity, the subject matter of the broadcast, the documented mass search, the recovery and forensic examination of contraband phones, and the resulting officer arrest were circumstantial and documentary evidence reasonably considered during Plaintiff's investigation.

54. Plaintiff alleges that this evidence was relevant because Defendant later asserted that no article could be produced showing any officer was ever arrested and asked, in substance, "what officers got arrested." Source, approximately 6:45–7:03: https://youtu.be/_BXyt58MtoI?si=7LVw3L1nccP9Ciy1

**J. Selective Guilt-by-Association Evidence**

55. Plaintiff alleges that Defendant's guilt-by-association rhetoric was selectively deployed against Plaintiff as a reputational weapon rather than as a principle Defendant consistently applied.

56. Plaintiff alleges that Defendant has publicly associated and/or maintained a business relationship with recording artist Daniel Hernandez, professionally known as Tekashi 6ix9ine, and has publicly promoted Hernandez's commercial relevance and popularity.

57. Hernandez's December 18, 2019 federal sentencing transcript states that, on October 26, 2018, Hernandez began a four-year term of probation for his New York state offense of "use of a child less than 17 years old in a sexual performance." The underlying 2015 case arose from an incident in which Hernandez, then eighteen years old, was depicted in sexually explicit recordings involving a thirteen-year-old girl. Public reporting describing the criminal complaint states that Hernandez had physical sexual contact with the child, including touching her buttocks, while she was nude and engaged in sexual activity with another adult male. Plaintiff relies on the authenticated court record for the conviction and sentence and on the underlying charging materials or other admissible evidence for the specific facts of the incident.

58. The same federal sentencing transcript establishes that Hernandez pleaded guilty on February 1, 2019 pursuant to a cooperation agreement to nine federal counts, including racketeering conspiracy, attempted murder in aid of racketeering, assaults with a dangerous weapon in aid of racketeering, narcotics conspiracy, and firearms offenses. At sentencing, the Government moved for a downward departure and relief from mandatory minimum and consecutive sentences on account of Hernandez's cooperation, and the Court granted the motion.

The Government characterized Hernandez's cooperation as "extraordinary," while the Court found that a substantial downward departure was warranted because of his substantial assistance.

59. Plaintiff alleges that Defendant nevertheless has maintained a public and/or business association with Hernandez, promoted Hernandez's commercial relevance, referenced the attention and views generated by Hernandez's name, and favorably compared aspects of Hernandez's public activity to Defendant's own activities.

60. Plaintiff does not allege that Hernandez's criminal conduct or cooperation is attributable to Defendant merely because Defendant associates or conducts business with Hernandez. To the contrary, Plaintiff alleges these facts because Defendant attacked Plaintiff through guilt-by-association rhetoric concerning Plaintiff's father, including asking in substance, "your dad plays with boys, what does that make you?" while Defendant's own conduct demonstrates that he does not invariably treat another person's conviction as defining everyone who associates or does business with that person.

61. Plaintiff further alleges that the comparison is relevant to Defendant's attacks involving alleged "rats," "snitches," and cooperators. Defendant has publicly condemned and stigmatized others on that basis, while maintaining an association with Hernandez notwithstanding Hernandez's documented federal cooperation agreement and substantial assistance to the Government.

62. Plaintiff alleges that these circumstances are circumstantial evidence that Defendant selectively employed allegations concerning sexual misconduct, criminal association, and cooperation when useful to discredit Plaintiff, rather than applying those asserted principles consistently. Plaintiff alleges this inconsistency is relevant to Defendant's motive, credibility, and state of mind; Plaintiff does not allege that the association alone establishes actual malice.

63. Plaintiff further alleges that Defendant's own public account of an October 7, 2012 Tampa Police encounter provides additional circumstantial evidence concerning the selective nature of the guilt-by-association rhetoric. Contemporaneous TPD records identify Defendant, then eighteen years old, in an encounter involving two persons identified as juveniles; the records reflect that one juvenile was taken into custody for possession of a controlled substance.

64. In Defendant's later account of that encounter, Defendant stated, in substance, that the female accompanying the group "used to pull more females than us," that "that's why we were cool with her because she's the one that's gonna bring the girls," and that the group had just left a party where Defendant described observing female-on-female sexual activity and "ecstasy, weed, liquor floating all around."

65. Plaintiff does not allege from those facts that Defendant committed a sexual offense, furnished drugs or alcohol to a minor, or engaged in sexual conduct with a minor. Plaintiff alleges those facts only as circumstantial evidence concerning Defendant's state of mind and the selective nature of the guilt-by-association rationale directed at Plaintiff.

**K. Actual Malice and Intent to Convey Defamatory Implications**

66. Plaintiff alleges that Defendant knew the subject matter and actual evidentiary basis of Plaintiff's investigation because Defendant expressly responded to and attempted to rebut Plaintiff's reporting.

67. Defendant possessed personal knowledge of his own incarceration, housing history, grievances, witness statements, photographs, criminal cases, jail calls, and public statements, giving him direct access to facts material to the dispute.

68. Plaintiff alleges that Defendant nevertheless substituted the fabricated proposition that Plaintiff called Defendant a "cop" because Defendant's great-grandfather was a cop for the records, statements, and investigative reasoning Plaintiff had actually presented.

69. Plaintiff alleges that the substitution was material because it portrayed Plaintiff's investigation as irrational guilt by association rather than a records-based investigation that included Defendant's own FDC statements identifying Jimmy Horey as an alleged assailant and Rashad Hart as a witness; law-enforcement records documenting communications by persons associated with Defendant; Defendant's own monitored jail-call account; and Defendant's public statements concerning dissemination of inmate-supplied prison information.

70. Plaintiff further alleges that Defendant's own FDC witness statement gave Defendant personal knowledge that he had identified Rashad Hart as a witness, yet Defendant later made the categorical statement that Jimmy Horey was the only inmate involved who named someone in a witness statement.

71. With respect to the petition allegation, Plaintiff alleges that Defendant had access to the dates of the records yet falsely or recklessly stated that Plaintiff signed the 2017 petition "knowing" information that Plaintiff alleges did not become publicly accessible until 2021.

72. With respect to Plaintiff's criminal history, Plaintiff alleges that Defendant presented an accusation from an initial report as though it were the legal outcome despite Defendant's claimed expertise in criminal records and paperwork.

73. Plaintiff alleges that Defendant's repeated use of statements such as "biggest fraud on YouTube," "what does that make you," "Stop spreading BS," and "The cut ain't fake. The picture ain't fake, but y'all see who is," when considered in context and together with the factual assertions described above, was intended to communicate that Plaintiff was dishonest, fraudulent, and knowingly deceptive.

74. Plaintiff alleges that Defendant knew the challenged factual assertions and implications were false, or subjectively entertained serious doubts about their truth and published them anyway. Plaintiff further alleges, as to implication claims, that Defendant intended or recklessly disregarded the likelihood that viewers would understand the defamatory meanings alleged herein.

**L. Publication and Damages**

75. Defendant published the challenged statements to large audiences through YouTube and third-party interviews, where the statements were capable of being viewed, repeated, commented upon, and redistributed.

76. Plaintiff alleges that the publications caused reputational injury, humiliation, emotional distress, loss of business opportunities, loss of income, and damage to the credibility of Plaintiff's investigative work.

## IV. CAUSES OF ACTION

### COUNT I — DEFAMATION AND DEFAMATION BY IMPLICATION (Florida Law)

77. Plaintiff realleges paragraphs 1 through 76.

78. Defendant published statements of and concerning Plaintiff to third persons.

79. Plaintiff alleges that the actionable statements include false factual assertions and statements that, through juxtaposition and context, conveyed false defamatory implications concerning Plaintiff's honesty, criminal history, investigative integrity, and knowing support of sexual misconduct involving a minor.

80. Plaintiff alleges that Defendant also falsely attributed to Plaintiff the factual premise that Plaintiff called Defendant a police officer merely because Defendant's great-grandfather was a police officer, and used that false attribution to portray Plaintiff's investigation as fraudulent and irrational.

81. Plaintiff alleges that the statements and implications identified above were false or materially misleading for the reasons specifically pleaded in this Complaint.

82. Plaintiff alleges that Defendant acted with the degree of fault required by applicable law and, to the extent Plaintiff is deemed a public figure or limited-purpose public figure, acted with actual malice by publishing with knowledge of falsity or reckless disregard for truth.

83. As to defamation by implication, Plaintiff further alleges that Defendant intended to convey, or recklessly disregarded the likelihood that his audience would understand, the defamatory implications pleaded above.

84. Defendant's publications caused Plaintiff actual reputational, emotional, professional, and economic harm.

### COUNT II — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85. Plaintiff realleges paragraphs 1 through 76.

86. Plaintiff alleges that Defendant engaged in an intentional and targeted course of conduct that included severe accusations concerning Plaintiff and his family, allegedly false assertions about Plaintiff's criminal history, and repeated publications designed to expose Plaintiff to public contempt and humiliation.

87. Plaintiff alleges that Defendant intended to cause emotional distress or acted with reckless disregard of the probability of causing emotional distress.

88. Plaintiff alleges that the totality of the conduct was extreme and outrageous and caused severe emotional distress, panic, humiliation, and mental anguish.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendant and requests: (a) compensatory damages in an amount to be determined at trial; (b) proven special and economic damages; (c) punitive damages to the extent permitted by applicable law and upon satisfaction of any procedural prerequisites; (d) taxable costs and any other relief authorized by law; and (e) such further relief as the Court deems just and proper.

Plaintiff preserves his request for appropriate prospective relief but recognizes that any injunction restraining future speech must satisfy the First Amendment and applicable federal standards.

## VI. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

BYRON E. BLAKE, JR.
Plaintiff, Pro Se
1303 Fox Chase Dr
St. Charles, MO 63301
(773) 913-5737
Officialbyronblake@gmail.com